## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No.: 1:23-CR-00368-TNM |
| | : | |
| JUSTIN LEE | : | |
| | : | |
| Defendant. | : | |

### DEFENDANT JUSTIN LEE'S SENTENCING MEMORANDUM

Justin Lee, Defendant, by and through his attorney, submits this memorandum in aid in sentencing.

### Recommendation of Sentence of Probation

Taking into the consideration the entire circumstances of the defendant's actions on January 6th as well as his extraordinary record of service as a police officer for Montgomery County, Maryland, the Court is asked to impose a sentence of probation or home detention.

### I.      Nature and Circumstances of the Offense

Defendant Lee was 23 years of age at the time of the events in this case. Vol. 2, 30. He lived in Rockville, Maryland with his parents and one sister. *Id.* He holds a bachelor's degree from the University of Maryland, which he obtained in 2018. Id., 31. And he worked as a supply chain analyst for Otsuka Pharmaceutical Company. Id.

His father is from Hong Kong, China and his mother is from Taiwan. Id. 35. He and his family were aware of "great unrest" in Hong Kong which was the site of "passionate protests" against the encroachment of the communist party, which was against self-rule there. Id., 36. Members of his father's family were active participants and it was something that his family agreed with and celebrated. Id.

Here in this country, Lee attended the inauguration of President Trump in 2017 and was introduced to large scale protests against Trump's presidency that day. Id., 33. He became more active. He went to Annapolis to speak for or against bills before the General Assembly of Maryland.  Id., 34. He also attended many protests for and against certain causes and speakers. Id. Among those were March for Life, protests over Justice Cavenaugh's appointment,rallies for free speech, George Floyd and was introduced to large scale protests against Trump's presidency that day. Id., 33-34.  At rallies and protests he had a chance to see crowds of people interact with the police. Id.

Prior to January 6, 2021, Lee had been to the grounds of the Capitol for family visits,  Christmas season, and made occasional after hours visits when no one is around. Id., 35.  On January 6th, Lee caught the Metro to come see Trump for what he thought was Trump's final public appearance. Id., 31.  He supported the President and had voted for him. Id., 32.

On January 6th, Lee caught the Metro to come to Washington, D.C. to see what he thought was to be Trump's final public appearance before leaving office. Id. 31. He voted for Trump and wanted to attend.  Id., 32. He arrived around noon. Id. 40.  He arrived late and did not attend the President's speech. Id. He saw large crowds in the streets moving up Constitution Avenue around the Smithsonian museums and they announced that they were headed to the Capitol. Id., 41. Lee testified that there were "thousands of people all walking down the street at once," and that "its probably the biggest crowd I've ever been among in my entire life." Id., 43.  He made his way to Peace Circle and the crowd was standing or milling around. Id. 43. He stood around "waiting to see what state was of the protest." Id. He learned later about a breach that occurred at the Pennsylvania walkway, but he said he was not aware of it because his vision of it was obscured by bushes and shrubbery.  Id., 44.  He acknowledged that there were "Area Closed" signs and that he

had picked one up from a trash pile, but he did not know that the signs "signified a restricted area." Id., 44 & 53. He did not know that the signs prohibited him from being on those areas. Id., 45. He testified that he stood on the Olmstead Wall and looked back to get a "better view" of all the people coming to the area. *Id.*, 46. He saw more people moving up both the Pennsylvania and Maryland walkways. *Id.* Then people started to move onto the grounds. Based upon the large number of people, Lee testified that he "thought we were moving forward to a scheduled event." *Id.*, 47. According to a history of attending other demonstrations, Lee felt that events of this kind were "very, very coordinated, scheduled and planned." *Id.*, 50. Other factors he took into consideration were that there was a very small presence of police officers – "a handful"—and that he "wasn't used to seeing so few officers for such a large group of people." *Id.*, 48. He testified that there was a lack of a "hard line barrier"; he also thought that the snow fencing was "a cordon for … whatever event that was going to be scheduled there." *Id.*, 50. He thought that if the area were closed, it would have meant the people would have had to pour out into the streets. *Id.,* 49-50. For this reason, he did not think that people were "storming" or "breach[ing]" the grounds, but rather it "seemed like they already, really, arranged for, I guess, the area of the Mall to have all these people." *Id.*, 51. Lee testified that as part of his own historical knowledge, he knew that other protests had taken place on Capitol grounds, and he referred to the Bonus Marchers in the 1930's, the Viet Nam anti-war protests, and Occupy Wall Street protests. *Id.*, 51.

Lee decided that he would make his way up the steps to the Capitol grounds on the west side. Id., 52.He crossed the law to get to the Pennsylvania walkway and the area around the Olmstead Wall. Id. Then he moved to the "Maryland pathway." Id. He said he was "just exploring around." Id. He thought this was "where we were going to be all day," and that he would "take pictures and explore the grounds." Id.

Lee denied passing through a line of officers "in a cordon." Id., 54. He did see a line of officers in formation but he did not pass them. Id., 55. Lee testified that if the police "have a physical presence," he didn't "make an effort to move past that." Id., 56.

Lee testified that once the "line had receded and a lot of people – I mean a lot of people, like thousands of people already made their way up through the scaffolding and the area around the terraces." Id., 56. He said he waited at least a half and hour, and after not seeing any signal to indicate that people were not supposed to be there, he moved up to the area where all of the people were. Id., 56. He saw a cordon of officers on the upper terrace, directly on the level of the doors and windows of the Capitol building. Id., 57. He called it a secondary perimeter, and that he did not go beyond it. Id. The officers didn't say anything to anyone to indicate what "they wanted to happen." Id., 58. He thought that the officers probably didn't want people going into the Capitol, and so he didn't make any attempt to force his way inside." Id., 58.

Lee explained that he was staying around because he thought speakers, even Trump, were supposed to show up. Id., 59. Again, he did not think it was a "breach," but that it was a "scheduled event at the Capitol grounds and ultimately something significant was going to happen." Id. 59. He then moved up to the area of the snow fencing to the area right below the steps in the Plaza. Id.

He saw people standing around, shouting and cheering, and the police had to use force against people in the crowd. Id., 60. Lee described, from his observation, a "quickly evolving" situation for "people in the crowd." Id., 60. The police had moved up to the higher elevation of the steps, and if people approached them the police shoved them, and he said some people fell, and Lee felt that they did not deserve that. Id. People got angry, and started to shout and confront the police. Id. The officers on the terrace began to use munitions and shooting rubber bullets and paint

balls. Id., 61.  People were getting hit in the face.  Id. 61. Lee testified that he that "it seemed like a playbook out of 2020." Id.  Then officers started breaking out large cans of pepper spray and tear gasa, and rubber grenade balls.  Id., 62. Lee testified that this was not with any prior warning or dispersal order, including an instruction how to avoid this sort of thing and what to do -- which he had personally seen at other protests he had been to. Id. 62.  These munitions were tossed deep into the crowds and lot of them ended up behind the all that Lee was on. Id., 63.

Lee described the effects of tear gas and pepper spray as being "horrifying" because it makes it hard for one to breathe. Id. 64. He brought in his backpack water and bandages, and he was going through his supplies to help others. Id., 65.

Lee testified that he saw activity going on at the tunnel and some hostility directed at officers in the tunnel by the persons on the receiving end of the officers' actions. Id., 69. He saw officers there using force, which he testified that he did not begrudge the officers for using. Id.

Lee testified that he felt some "ire," but that at the end of the day he was not going to try to do something illegal. Id. 65.  A man handed him a smoke device, which he recognized as such, and which he had seen several used that day. Id., 72.  There was a lull in the action, but it did not last, and more activity started up.  Id., 73. He pulled the ring, smoke emanated from it, and, intending "to make my voice heard," he tossed the smoke device over the heads of those in front of him and in the direction of the tunnel. Id. 73. Lee explained that he "didn't really throw it all that hard."  Id., 74.  He said the device was not more than 3 ounces. Id. Asked if he had any intention of hurting the officer, Lee said, "No, not at all."  Id., 74. He had seen these smoke devices used before, and that they "were super common at a protest." Id. He did not think he could or desired to change the officers their stance there. Id. He did not think that by using it the officers would get hurt or die or suffer pain or injury. Id., 75.  He denied "aiming" at them or trying to

disrupt what they were doing. Id. "I knew they had a wall of shield around them," and that the smoke device "can land into the area around, or sort of, the front of them." Id.

After he tossed the device and it produced smoke, Lee said that no one engaged with the officers, and the officers did not engage with the persons there. Id., 76. To Lee, it was as if the situation was reset to the *status quo ante*. Id.

Lee acknowledged tossing other items, but there was no evidence that anyone was struck by them, and the prosecutor disclaimed that the charges were founded on such actions. There is no evidence that these objects were "rock like objects." Lee testified that he was "not completely sure what they are," but that after some reflection he said he "found them on the ground" and they were "like rubber or plastic pads for maybe construction around the scaffolding area … maybe they are plastic caps …." Vol. 2, 77. He testified that each object "was really incredibly light. Not hard at all, really. Less than an ounce, really." *Id.* He noticed that they didn't make much of an impact and that no one noticed them, so he quickly stopped. Id., 78.

This particular part of the episode happened at 4:46 p.m., and that by that time it was getting dark. He thought it a good idea to use his flashlight to shine a light on the scene of the tunnel as a matter of safety for all concerned. Id., 80.

When the sun set, the officers came out of the tunnel and cleared everyone off the terrace. Id. 81. Lee took that as a signal to evacuate with everyone else and left and went straight home. Id., 82.

The smoke device in question made contact with the shield of MPD Officer Jason Sterling. He admitted that the smoke device did not cause him or the other officer to move from their positions. Id., 146. Nor did anyone succeed in getting into the tunnel. Id. Sterling was wearing a gas mask and denied breathing in any of the smoke from the device. Id. 148.

II.        <u>**History and Characteristics of the Defendant**</u>

In April 2021, Lee applied to the Montgomery County Police Department to become a police officer. Id., 7. He was accepted, went through the academy and graduated. He went straight into a patrol unit in 2022. He performed the ordinary duties of patrol officer. It certainly was a more active and interesting job than the desk job he had previously with the pharmaceutical company. Like any job, it had its routine moments. Until one day when the routine was broken by an unusual event that was to become a defining moment in Lee's life. On July 22, 2023, mid-morning, Officer Lee was on patrol when he heard a broadcast over the radio for a man who was a suspect in four stabbings which just occurred in quick succession and apparently randomly. The man was running free on the street in Lee's area of patrol. Lee spotted the man, who was carrying a butcher knife raised in his hand. Without hesitation, he got out of his patrol car to confront the man. The man came running down the street and made a bee line for Lee. Lee backed up and issued loud verbal warnings to stop and drop the knife. Lee continued to back up and issue warnings, but it made no difference. The man continued running toward him. At about 10 feet, Lee discharged his police service weapon and struck the man three times, in quick rapid fire, in the upper torso. The individual was mortally wounded. The Montgomery County police department placed on its website a video recording from Officer Lee's body worn camera of the police officer involved shooting as well as other relevant police footage of the incident. It may be viewed as this link: https://www.youtube.com/watch?v=KI_IHB0-0Cg

The shooting was thoroughly investigated by the Maryland Attorney General's Office. It determined to be a justified action on Lee's part. He was not disciplined.

Unfortunately, within a month Lee was called into police headquarters where FBI agents presented him with a letter from the United States Attorney's Office of the District of Columbia

that he was under investigation and that he should retain counsel to represent him. This was the beginning of the end for his career as a police officer, for once his employer found out that charges relating to January 6th were to be brought, Lee's was placed on leave without pay, and ultimately terminated after he was found guilty in the case pending here.

The significance of Lee's courage and bravery should be reflected in the sentence imposed. There is no question but that his actions likely saved the lives of others who were at risk to the next person the knife-wielding man came across. He had already stabbed four people. He was clearly likely to do the same to others. Lee put his life on the line to make sure that did not happen.

Let's take another example of Lee's uncommon courage. On Inauguration Day of President Trump in 2017, Lee saw an anti-Trump protestor rip a MAGA hat off of someone and flee. He immediately jumped and ran after the culprit and wrestled the hat back. This was captured on video. https://drive.google.com/file/d/1Z6zKRPd_8-YBATuTA9BbnZldGu4jf4CL/view?usp=sharing. No doubt Lee is someone you want in your foxhole.

Craig Anderson, a retired government employee, who knows Lee well because he was his son's friend in college, clearly recognized Lee's extraordinary heroism. He recognized Lee as also friend, willing to offer help, generous and all around good fellow. Other character letters from Lee's friends are attached. They attest to his good character, his good friendship, and his desire to help others.

Finally, Lee's parents have submitted a fine letter for their son. Their hearts are broken. Lee is a good man, worthy of the Court's mercy and leniency.

a. **Special Consideration for Lee's Status as a Police Officer**

A sentence of imprisonment will be very difficult for Lee. A police officer facing imprisonment faces serious risk to his life and harsh conditions. Nearly all prisoners view police officers negatively. Officers are the ones who in most cases are directly responsible for their imprisonment. The officers investigate crime, determine who committed the crime, and usually make the arrest. They also testify against the accused. Thus, there is no love-lost by prisoners for police officers. But what makes matters worse, the risk to a police officer in prison increases if the officer has killed an individual in the line of duty. The officer is a marked man in prison.

In order to protect Lee, he will have to serve his time in protective custody. This could mean solitary confinement, which leads to stress and breakdown. Even solitary confinement may not save Lee from assault by other inmates who bear a grudge. Derek Chauvin, who was stabbed repeatedly, comes to mind.

It is for this reason that the Court should consider a sentence other than imprisonment. There is nothing to be gained to protect such a man as Lee behind bars where his life will be put at risk or the conditions will be unbearable.

Lee's conduct in this case was not violent. Indeed, the Court found him not guilty of committing acts of violence, which is defined as assault. In tossing a small smoke bomb weighing less than three ounces in the vicinity of the officers, Lee's conduct lies in a twilight zone between inherently expressive conduct protected by the First Amendment and the criminal acts charged in this case. No officer was hurt or injured. The smoke did not cause them to move from their position or enable anyone to get into the tunnel. One has to strain to find any substantial impact on the officers' performance of duties due to Lee's actions.

The government surely seeks deterrence and punishment here, but Lee's career has been ruined and he must live the rest of his life as a convicted felon. That would seem to be enough

punishment for a young man who had a good education, no criminal record, a promising career in law enforcement ahead of him, and the hope of starting his own family some-day. Lee has had punishment enough for his misjudgment and miscalculation on January 6.

### III.    Legal Standard Applicable to Sentencing

A district court should begin all sentencing proceedings by correctly calculating the range of the sentence under the United States Sentencing Guidelines. *Rita v. United States*, 551 U.S. 338, 347-348 (2007). The guidelines, which are not mandatory, *United States v. Booker*, 543 U.S. (20050, are "a starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 51 (2007). They "are not the only consideration, however." *Id*. After giving the parties "an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a)1 factors to determine whether they support the sentence requested by the party." *Id*. The district judge "must make an individualized assessment [of the appropriate sentence] based on the facts presented." *Id*.

### IV.    Sentencing Guidelines Calculation

The Defendant was found Guilty at a bench trial on four Counts: Count 1 of Impeding or Interfering with a Police Officer during a Civil Disorder; Count 2 in violation of 18 U.S.C. § 231(c)(3); Assaulting, Resisting, or Impeding a Police Officer in Violation of 18 U.S.C. § 111(a)(1); Count 3, Entering and Remaining in a Restricted Building, in violation of Title 18, United States Code, § 1752(a)(1); Count 4, Disorderly and Disruptive Conduct in a Restricted Building, in violation of Title 18, United States Code, Section 1752(a)(2)); and Count 6, Disorderly Conduct in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(D).

The Presentence Investigation Report makes several material errors in calculating the Guidelines Sentence.

**First Error**

The Report applied an adjustment for Obstruction of Justice, USSG § 3C1.1, for alleged false testimony by Lee at trial. This is not supported by the record. Each specific instance alleged in the report is set forth below with Mr. Lee's response, as follows:

• "Defendant Lee stated he did not know the Capitol grounds were closed and instead thought a planned event may be occurring there. Evidence presented at trial shows defendant Lee carrying an Area Closed sign and helping other rioters climb over a wall and break through the snow fencing."

**Response: At trial, Lee testified that he did not know that the area was "restricted" as that term is defined by 18 U.S.C. Sec. 1752. Vol. 2, 44. He also testified that he believed at that time that the "Area Closed" signs did not prohibit him from going on to the grounds of the Capitol, and he cited reasons. He testified that he stood on the Olmstead Wall and looked back to get a "better view" of all the people coming to the area. *Id.*, 46. He saw more people moving up both the Pennsylvania and Maryland walkways. *Id.* Then people started to move onto the grounds. Based upon the large number of people, Lee testified that he "thought we were moving forward to a scheduled event." *Id.*, 47. According to a history of attending other demonstrations, Lee felt that events of this kind were "very, very coordinated, scheduled and planned." *Id.,* 50. Other factors he took into consideration were that there was a very small presence of police officers – "a handful"—and that he "wasn't used to seeing so few officers for such a large group of people." *Id.,* 48. He testified that there was a lack of a "hard line barrier"; he also thought that the snow fencing was "a cordon for … whatever event that**

was going to be scheduled there." *Id.*, 50.  He thought that if the area were closed, it would have meant the people would have had to pour out into the streets. *Id.,* 49-50.  For this reason, he did not think that people were "storming" or "breach[ing]" the grounds, but rather it "seemed like they already, really, arranged for, I guess, the area of the Mall to have all these people." *Id.*, 51.  Lee testified that as part of his own historical knowledge, he knew that other protests had taken place on Capitol grounds, and he referred to the Bonus Marchers in the 1930's, the Viet Nam anti-war protests, and Occupy Wall Street protests. *Id.*, 51.

In sum, Lee testified that he believed or thought that he was not prohibited from being in that area of the Capitol grounds where he was, and he cited the reasons for that belief. These reasons were not inherently incredible or false. The Court indeed found Lee guilty of violating Sec. 1752.  But that may have been because it thought that Lee's reasons were mistaken or faulty and insufficient to raise a reasonable doubt in the Court's mind.  This is a long way from proving that Lee's testimony was false, i.e., factually untrue.

- • "Defendant Lee testified he did not aim the smoke bomb at police when he threw it, and only threw the smoke bomb to make his voice heard. During cross examination, he admitted that he threw the smoke bomb at police officers."

**Response:** This claim is inconsistent with Lee's testimony and the Court's findings.  Lee testified: "I wasn't aiming at them in particular.  I knew they had a wall of shields around them. I thought, [w]ell, you know, it can land into the area around, sort of, in front of them."  Vol. 2, 75.  Lee did not admit on cross-examination, as the report claims, that "he threw the smoke bomb *at* police officers." On cross, Lee testified that he tossed the smoke device at the "police line." *Id.*, 100.  This is consistent with his testimony on direct examination.  It is significant that the report ignores the Court's findings. The Court stated

that it "could not find beyond a reasonable doubt that Mr. Lee intended to strike anyone with a device." Vol. 3, 12. It follows that the report's claim of false testimony in this instance is not supported by the record.

- "Defendant Lee testified the three unknown objects he threw were very small, one-ounce objects, similar to pads placed on the bottom of furniture. However, open-source video showed these objects to be spherical and larger than a single ounce."

Response: The report offers the author's opinions as to what the objects were and how much they weighed. Apart from video and photographs, what those objects were came from Lee's uncontradicted testimony. He testified that he was "not completely sure what they are" – after all the charges were brought more than two years after the fact. But Lee testified that the objects were "like rubber or plastic pads for maybe construction around the scaffolding area … maybe they are plastic caps …." Vol. 2, 77. He testified that each object "was really incredibly light. Not hard at all, really. Less than an ounce, really." *Id.* The Government did not call a witness to dispute Lee's testimony. Nor did it call any witness to say that the objects struck anyone. The report is not free to offer speculation as evidence of what the objects were or how much they weighed, and speculation is not a basis to accuse a person of testifying falsely.

- "Defendant Lee testified he had shined a light toward the police line to illuminate the scene since it was getting dark out. However, the Tunnel had overhead lights on and it was not dark out yet. In addition, defendant Lee's flashlight was shined at officers, not in a manner of trying to illuminate the crowd."

Response: The author of the report lacks any basis to claim that Lee's testimony that "it was getting dark out" is false. The time of the occurrence was 4:46 p.m. Officially, sunset

**was at 5:02 p.m. on January 6, 2021, in Washington, D.C.  At 16 minutes before sunset, the sun is very low on the horizon.  This is quite consistent with Lee's testimony that "it was getting dark out." The report's claim that Lee's testimony was false is not supported by the record and must be rejected.**

In sum, the Report erred by applying an adjustment for Obstruction of Justice USSG §3C1.1 for +2.  As discussed above, the report's determination that the defendant willfully impeded the administration of justice by giving false testimony is not supported by the record.

**Second Error**

The Report failed to apply the Adjustment for Zero-Point Offenders, § 4C.1 which decreases the offense level by 2. Lee meets all 10 qualifying requirements. In particular, he meets criteria (3) of § 4C.1, namely, that "the defendant did not use violence or credible threats of violence in connection with the offense." The Court's decision stated that it did not find beyond a reasonable doubt that the defendant engaged in acts of physical violence as charged in Counts 5 and 7.

Correcting these errors, the defendant has a Base Offense Level of 10. Because he is eligible for a Zero-Point Offender Adjustment of -2, his combined offense level is 8.  This puts him in Zone A. Applying an individualized assessment of the facts presented in this case and the other relevant sentencing factors, a sentence of probation is the appropriate sentence for this defendant, and the Court is urged to impose it.

Respectfully submitted,
**ROBERTS & WOOD**

  /s/ Terrell N. Roberts_____
Terrell N. Roberts, III
DC Bar No. 965061
*Attorney for Defendant*
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
(301) 699-0764
(301) 699-8706 Fax
troberts@robertsandwood.com

### <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was electronically filed via CM/ECF system on this 15th day of November 2024, and an electronic copy was e-served to:

Adam Dreher, Esq.
Assistant United States Attorney
Office of the United States Attorney, District of Columbia
555 4th Street, NW
Washington, D.C. 20530

  /s/ Terrell N. Roberts_____
Terrell N. Roberts, III

**Exhibit List for Defendant Justin Lee's Sentencing Memorandum**

1. Statement of Danny Lee & Blanca Chou
2. Statement of Craig Anderson
3. Statement of John Anderson
4. Statement of Kane Hsu
5. Maryland OAG Report on Police-Involved Death on July 22, 2023 (Redacted)