UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:23-CR-00368-TNM |
| | : | |
| JUSTIN LEE | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT JUSTIN LEE'S AMENDED SENTENCING MEMORANDUM**

Justin Lee, Defendant, by and through his attorney, submits this memorandum in aid in sentencing.

**Recommendation of Sentence of Probation**

Taking into the consideration the circumstances of the offense, the defendant's history and background, the Sentencing Guidelines, and his record of distinguished service as a police officer since the offense, the Court is asked to impose a sentence of probation.

**I.      Nature and Circumstances of the Offense**

At the time of the events in this case, defendant Lee was 23 years of age.  Vol. 2, 30. He lived in Rockville, Maryland with his parents and one sister. *Id.*  He held a bachelor's degree from the University of Maryland (2018), and he worked as a supply chain analyst for Otsuka Pharmaceutical Company. *Id.,* 31.

Lee's father is from Hong Kong, China and his mother is from Taiwan.  Id. 35. He and his family were aware of "great unrest" in Hong Kong which was the site of "passionate protests" against the communist party. Members of his father's family were active participants in the protests. *Id.*

Here in this country, Lee attended the 2017 inauguration of President Trump, and he saw large scale protests that day. Id., 33. He grew more politically active. He went to Annapolis to

speak for or against bills before the General Assembly of Maryland. *Id.*, 34. He also attended many protests for and against certain causes and speakers. Id. Among those were March for Life, protests over Justice Cavenaugh's appointment, free speech rallies, and George Floyd protests. *Id.*, 33-34. At these events, he had many opportunities to see crowds of people interact with the police. *Id.*

Prior to January 6, 2021, Lee had been to the grounds of the Capitol for family visits, Christmas season, and he made occasional after-hours visits when no one was around. *Id.*, 35.

On January 6th, Lee caught the Metro to come to Washington, D.C. to see what he thought was Trump's final public appearance before leaving office. *Id.*, 31. He arrived around noon. *Id.* 40. He saw large crowds in the streets moving up Constitution Avenue around the Smithsonian museums. He heard people announce that they were headed to the Capitol. *Id.*, 41. Lee testified that there were "thousands of people all walking down the street at once," and that "its probably the biggest crowd I've ever been among in my entire life." *Id.*, 43. It was already too late for him to attend Trump's speech on the Ellipse, so he made his way with the crowd. At Peace Circle, the crowd was standing and milling around. *Id.* He stood around as well "waiting to see what the next stage was of the protest." *Id.* He learned later about a breach that had occurred at the Pennsylvania walkway, but he said he was not aware of it because his view of that area was obscured by bushes and shrubbery. *Id.*, 44. He acknowledged that there were "Area Closed" signs. He said that he had picked one up from a trash pile and held on to it as a souvenir. He testified that he did not know that the signs "signified a restricted area" or prohibited him from being in those areas. *Id.*, 44-45, 53. He testified that he stood on the Olmstead Wall and looked back to get a "better view" of all the people coming to the area. *Id.*, 46. He saw more people moving up both the Pennsylvania and Maryland walkways. *Id.* Then people started to move onto the grounds. Based upon the large

3

number of people, Lee testified that he "thought we were moving forward to a scheduled event." *Id.*, 47. According to his experience with other demonstrations, Lee felt that events of this kind were "very, very coordinated, scheduled and planned." *Id.*, 50. Other factors he took into consideration were that there was a very small presence of police officers – "a handful"—and that he "wasn't used to seeing so few officers for such a large group of people." *Id.*, 48. He testified that there was a lack of a "hard line barrier"; he also thought that the snow fencing was "a cordon for … whatever event that was going to be scheduled there." *Id.*, 50. He thought that if the area were closed, it would have meant the people would have had to pour out into the streets. *Id.*, 49-50. For this reason, he did not think that people were "storming" or "breach[ing]" the grounds, but rather it "seemed like they already, really, arranged for, I guess, the area of the Mall to have all these people." *Id.*, 51. Lee testified that as part of his own historical knowledge, he knew that other protests had taken place on Capitol grounds, and he referred to the Bonus Marchers in the 1930's, the Viet Nam anti-war protests, and Occupy Wall Street protests. *Id.*, 51.

 Lee decided that he would make his way up the steps to the Capitol grounds on the west side. *Id.*, 52. He crossed the lawn to get to the Pennsylvania walkway and the area around the Olmstead Wall. Id. Then he moved to the "Maryland pathway." Id. He thought this was "where we were going to be all day," and that he would "take pictures and explore the grounds." Id.

 Lee testified that he did see a line of officers in formation, but he did not pass them. *Id.*, 55. Lee testified that if the police "have a physical presence," he didn't "make an effort to move past that." *Id.*, 56.

 Lee testified that once the "line had receded and a lot of people – I mean a lot of people, like thousands of people already made their way up through the scaffolding and the area around the terraces." *Id.*, 56. He said he waited at least a half an hour, and after not seeing any signal to

4

indicate that people were not supposed to be there, he moved up to the area where all of the people were. *Id.*, 56. He saw a cordon of officers on the upper terrace, directly on the level of the doors and windows of the Capitol building. *Id.*, 57. Lee testified that it was a secondary perimeter, and he did not cross it. *Id.* The officers there didn't say anything to indicate what "they wanted to happen." *Id.*, 58. He thought that they likely didn't want people going into the Capitol, and so he didn't make any attempt to force his way inside. *Id.*, 58.

Lee explained that he stayed on the grounds because he thought speakers, even Trump, were supposed to show up. *Id.*, 59. Again, he believed it was a "scheduled event at the Capitol grounds and ultimately something significant was going to happen." *Id.*, 59. He then moved up to the area of the snow fencing to the area right below the steps in the Plaza. *Id.*

He saw people standing around, shouting and cheering, and the police had to use force against people in the crowd. *Id.*, 60. The officers on the terrace began to use munitions and shoot rubber bullets and paint balls. *Id.*, 61. People were getting hit in the face. *Id.*, 61. Then officers started breaking out large cans of pepper spray and tear gas, and rubber grenade balls. *Id.*, 62. Lee testified that there was no warning or dispersal order, and no instructions on how to avoid this sort of thing and what to do -- which he had personally seen at other protests. *Id.*, 62. He saw munitions tossed deep into the crowds behind the wall where Lee was. *Id.*, 63.

Lee said tear gas and pepper spray are "horrifying," because they make it hard for one to breathe. *Id.*, 64. He brought in his backpack water and bandages, and he exhausted his supplies to help others. *Id.*, 65.

Lee testified that he saw hostility directed at officers in the tunnel by the persons who were on the receiving end of the officers' use of force. *Id.*, 69. He felt some "ire," but he was not going to try to do something illegal. Id. 65. A man handed him a smoke device, which he knew was

5

commonly used at protests. *Id.*, 72, 74.  He said he wanted "to make my voice heard," and he pulled the ring, and it ignited and then tossed it over the heads of those in front of him in the direction of the tunnel. *Id.*, 73. Lee explained that he "didn't really throw it all that hard." *Id.*, 74. He said the device weighed not more than 3 ounces. *Id.* Asked if he had any intention of hurting the officer, Lee said, "No, not at all."  *Id.*, 74. He did not think that the officers would get hurt or suffer pain or injury. *Id.*, 75.  He denied "aiming" at the officers or trying to disrupt what they were doing. *Id.* "I knew they had a wall of shield around them," and that the smoke device "can land into the area around, or sort of, the front of them." *Id.*

After he tossed the device and it produced smoke, one can see that it had a transient effect which was chiefly to move the protestors away from the tunnel. Govt. Ex. 405, time marker 3:05 to 3:47. It had little to no effect on the officers. They didn't move from their positions, and they continued to defend the tunnel like they did before.  Govt. Ex. 510, time marker 47-1:24.

The officers were tightly packed together in a scrum with shields, visors and gas masks, and the protestors outside the tunnel were no match for them.  The protestors' efforts at this point consisted of little more than flailing at the officers' shields, and shouting. They appeared to be getting nowhere fast, and they knew it. Govt. Ex. 510.

Lee acknowledged that he tossed other small items which he found on the ground. *Id.*, 77. He said that he was "not completely sure what they are," but they were "like rubber or plastic pads for maybe construction around the scaffolding area … maybe they are plastic caps …." *Id.*  He testified that each object "was really incredibly light.  Not hard at all, really. Less than an ounce, really." *Id.*   He noticed that they didn't make much of an impact and that no one noticed them, so he decided not to lob any more. *Id.*, 78.

6

The incident happened at 4:46 p.m. *Id.*, 78. The day's events were drawing to a close. Lee testified that the sun set early at that time of year and that it was getting dark. *Id.* He thought to use his flashlight to shine a light on the tunnel as a matter of safety for all concerned. Id., 80.

Lee testified that when the sun set, the officers came out of the tunnel and cleared everyone off the terrace. *Id.*, 81. He took that as a signal to leave with everyone else and he went straight home. *Id.*, 82.

The smoke device tossed by Lee lightly struck the shield of MPD Officer Jason Sterling, as the officer's body worn footage depicts. Govt. Ex. 600, at time marker 1:45. Sterling would not yield from his testimony that he seemed to recall the event, although many things like this happened in the tunnel and Lee did not write a single note or report about it and he was not called to remember it until years later. Vol 1, 141-45. The officer admitted that it did cause the officers in the tunnel to move from their positions. *Id.*, 146. And that's what the video evidence shows. Govt Ex. 405, time marker 47 to 1:24. Sterling, too, acknowledged that no one succeeded in getting into the tunnel. Vol. 1, 146. He was wearing a gas mask, and he denied breathing any of the smoke from the smoke device. *Id.*, 148.

## II.     History and Characteristics of the Defendant

A few months after January 6th, in April 2021, Lee applied to the Montgomery County Police Department to become a police officer. Id., 7. He was accepted, went through the academy and graduated. He went straight into a patrol unit in January 2022.

An event was to occur in Lee's brief police career which would become a defining moment for him. On July 22, 2023, mid-morning, Officer Lee was on patrol when he heard two reports of multiple stabbings (4x) by a man wielding a knife. See attached Attorney General's Report, p. 1.Lee spotted the suspect, who was running through a residential neighborhood with a butcher

7

knife in his hand. Lee got out of his patrol car to confront the suspect. The man came down the street and made a bee line for Lee. Lee backed up and issued loud verbal warnings to stop and drop the knife. Lee continued to back up and issue warnings, but to no avail. As the suspect, now running, close to within a distance of 10 feet, Lee raised his service weapon and fired, striking the suspect three times. Soon thereafter, Lee and another officer felt for a pulse, but they did not feel one and both Lee and the other officers started to give chest compressions. The suspect was pronounced dead on the scene.

The Montgomery County police department placed on its website a video recording from Officer Lee's body worn camera as well as other relevant police footage of the incident. https://www.youtube.com/watch?v=KI_IHB0-0Cg

The shooting was investigated by the Maryland Attorney General's Office, which is charged by law to investigate all police related deaths. That investigation found that Officer Lee's use of force complied with all legals standards for the use of force.

In another notable instance of courage, but under less dangerous circumstances, on Inauguration Day in 2017, an anti-Trump rioter grabbed a Trump supporter's hat off his head and fled. Lee pursued the man and wrestled the hat from him and returned it to the rightful owner. This was captured by a journalist who was present when the incident happened. https://drive.google.com/file/d/1Z6zKRPd_8-YBATuTA9BbnZldGu4jf4CL/view?usp=sharing

In more ordinary circumstances, Lee is known for stepping up and lending a helping hand: "always impressed [] with his focus on service, both professionally as a Montgomery County police officer and, equally importantly, with his consideration and service directed to his friends," Craig Anderson, a career FEMA employee; "[h]e is a loyal friend, and one whom I found was always ready to offer help and support when needed," Douglas Drake, Viet Nam veteran and

8

nuclear engineer; and "he served friends, family, and community well," John Anderson, college friend.

### Special Consideration for Lee's Status as a Police Officer

Lee's choice to become a police officer shows his high respect for the law and commitment to justice. Lee's close friends noticed how proud he was when they attended his graduation for the police academy. Lee "beamed with pride at the awards he had won during training and what it seemed would be a bright future in law enforcement," Douglas Drake; when Lee graduated from the police academy, "I can truthfully say [it was] the proudest moment in Lee's life," Craig Anderson; "when I saw him there at the graduation ceremony he was jubilant as one might be a few times in life," John Anderson.

After striving hard to become a police officer, it is ironic that the defendant's status as a law enforcement officer could now become a serious detriment if he is sent to prison. A police officer faces serious risk and harsh conditions when he goes to prison. The risk increases substantially when it becomes known – and that is likely—that person had killed someone when he was an officer. In order to protect Lee, he will have to serve his time in protective custody. This means harsher conditions of confinement. And even protective custody may not save Lee from assault by other inmates who dislike or even hate police officers, as many do.

### III.   Legal Standard Applicable to Sentencing

A district court should begin all sentencing proceedings by correctly calculating the range of the sentence under the United States Sentencing Guidelines. *Rita v. United States*, 551 U.S. 338, 347-348 (2007). The guidelines, which are not mandatory, *United States v. Booker*, 543 U.S. (20050, are "a starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 51 (2007). They "are not the only consideration, however." *Id*. After giving the parties "an

opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a)1 factors to determine whether they support the sentence requested by the party." *Id*. The district judge "must make an individualized assessment [of the appropriate sentence] based on the facts presented." *Id*.

### IV.     Sentencing Guidelines Calculation

The Defendant was found Guilty at a bench trial on four Counts: Count 1 of Impeding or Interfering with a Police Officer during a Civil Disorder; Count 2 in violation of 18 U.S.C. § 231(c)(3); Assaulting, Resisting, or Impeding a Police Officer in Violation of 18 U.S.C. § 111(a)(1); Count 3, Entering and Remaining in a Restricted Building, in violation of Title 18, United States Code, § 1752(a)(1); Count 4, Disorderly and Disruptive Conduct in a Restricted Building, in violation of Title 18, United States Code, Section 1752(a)(2)); and Count 6, Disorderly Conduct in a Capitol Building, in violation of Title 40, United States Code, Section 5104(e)(2)(D).

The Presentence Investigation Report contains several material errors in calculating the Guidelines Sentence.

**First Error**

The Report applied an adjustment for Obstruction of Justice, USSG § 3C1.1, for alleged false testimony by Lee at trial. This is not supported by the record. Each specific instance of claimed false testimony is set forth below with Mr. Lee's response, as follows:

• "Defendant Lee stated he did not know the Capitol grounds were closed and instead thought a planned event may be occurring there. Evidence presented at trial shows defendant Lee carrying an Area Closed sign and helping other rioters climb over a wall and break through the snow fencing."

**Response: At trial, Lee testified that he did not know that the area was "restricted" as that term is defined by 18 U.S.C. Sec. 1752. Vol. 2, 44. He testified that he believed at that time that the "Area Closed" signs did not prohibit him from going on to the grounds of the Capitol. He testified that he stood on the Olmstead Wall and looked back to get a "better view" of all the people coming to the area. *Id.*, 46. He saw more people moving up both the**

10

Pennsylvania and Maryland walkways. *Id.* Those people started to move onto the grounds. Based upon the large number of people, Lee testified that he "thought we were moving forward to a scheduled event." *Id.*, 47. According to his experience attending other demonstrations, Lee felt that events of this kind were "very, very coordinated, scheduled and planned." *Id.*, 50. Other factors he took into consideration were that there was a very small presence of police officers – "a handful"—and that he "wasn't used to seeing so few officers for such a large group of people." *Id.*, 48. He testified that there was a lack of a "hard line barrier"; he also thought that the snow fencing was "a cordon for … whatever event that was going to be scheduled there." *Id.*, 50. He thought that if the area were closed, it would have meant the people would have had to pour out into the streets. *Id.*, 49-50. For this reason, he did not think that people were "storming" or "breach[ing]" the grounds, but rather it "seemed like they already, really, arranged for, I guess, the area of the Mall to have all these people." *Id.*, 51. Lee testified that as part of his own historical knowledge, he knew that other protests had taken place on Capitol grounds, and he referred to the Bonus Marchers in the 1930's, the Viet Nam anti-war protests, and Occupy Wall Street protests. *Id.*, 51.

Lee's reasoning is not inherently incredible or founded on falsehood. The Court indeed found Lee guilty of violating Sec. 1752, but that may have been because it thought that Lee's reasons were mistaken or faulty and not sufficient to raise a reasonable doubt in the Court's mind. This is a long way from proving that Lee gave false testimony concerning why he thought he was within the law to go on Capitol grounds.

• "Defendant Lee testified he did not aim the smoke bomb at police when he threw it, and only threw the smoke bomb to make his voice heard. During cross examination, he admitted that he threw the smoke bomb at police officers."

Response: This contradicts both Lee's testimony and the Court's findings. Lee testified: "I wasn't aiming at them in particular. I knew they had a wall of shields around them. I thought, [w]ell, you know, it can land into the area around, sort of, in front of them." Vol. 2, 75. Lee did not admit on cross-examination, as the report claims, that "he threw the smoke bomb *at* police officers." On cross, Lee testified that he tossed the smoke device at the "police line." *Id.*, 100. This is consistent with his testimony on direct examination. It is significant that the report ignores the Court's findings. The Court stated that it "could not find beyond a reasonable doubt that Mr. Lee intended to strike anyone with a device." Vol. 3, 12. It follows that the report's claim of false testimony in this instance is not supported by the record.

• "Defendant Lee testified the three unknown objects he threw were very small, one-ounce objects, similar to pads placed on the bottom of furniture. However, open-source video showed these objects to be spherical and larger than a single ounce."

Response: The report offers the author's opinions as to what the objects were and how much they weighed. Apart from video and photographs, what those objects were came from Lee's uncontradicted testimony. He testified that he was "not completely sure what they are" – after all the charges were brought more than two years after the fact. But Lee testified that the objects were "like rubber or plastic pads for maybe construction around the

11

**scaffolding area … maybe they are plastic caps ….." Vol. 2, 77. He testified that each object "was really incredibly light. Not hard at all, really. Less than an ounce, really."** *Id.* **The Government did not call a witness to dispute Lee's testimony. Nor did it call any witness to say that the objects struck anyone. The report is not free to offer speculation as evidence of what the objects were or how much they weighed, and speculation is not a basis to accuse a person of testifying falsely.**

• **"Defendant Lee testified he had shined a light toward the police line to illuminate the scene since it was getting dark out. However, the Tunnel had overhead lights on and it was not dark out yet. In addition, defendant Lee's flashlight was shined at officers, not in a manner of trying to illuminate the crowd."**

**Response: The author of the report lacks any basis to claim that Lee's testimony that "it was getting dark out" is false. The time of the occurrence was 4:46 p.m. Officially, sunset was at 5:02 p.m. on January 6, 2021, in Washington, D.C. At 16 minutes before sunset, the sun is very low on the horizon. This is quite consistent with Lee's testimony that "it was getting dark out." The report's claim that Lee's testimony was false is not supported by the record and must be rejected.**

In sum, the Report erred by applying an adjustment for Obstruction of Justice USSG §3C1.1 for +2. As discussed above, the report's determination that the defendant willfully impeded the administration of justice by giving false testimony is not supported by the record.

**Second Error**

The Report failed to apply the Adjustment for Zero-Point Offenders, § 4C.1. Lee meets all 10 qualifying requirements, and in particular paragraph (3) of that section, namely, that "the defendant did not use violence or credible threats of violence in connection with the offense." The Court found a reasonable doubt as to the defendant's guilt as to Counts 5 and 7 which charged the defendant with committing acts of physical violence. Thus, Lee is entitled to a decrease in 2 levels for this adjudgment.

It follows that the defendant has a Base Offense Level of 10 and deserves a decrease of 2 levels for a Zero-Point Offender Adjustment. Lee's combined offense level is 8. This puts him in Zone A, which authorizes a sentence of probation. USSG § 5B1.1(a)(1).

## Conclusion

The defendant respectfully asks this Court to consider a sentence of probation. Lee's life and accomplishments must be weighed against any brief lapse in judgment on January 6th. With the ruinous stain of a felony on his career and reputation, Lee has suffered enough. He did not injure or hurt anyone. He worked hard in school, was on his way to a good career, and earned the respect of friends and family. To cap it off, Lee's act of unquestioned bravery on July 22, 2023, merits our gratitude and respect, notwithstanding the events of January 6th.

As a final thought, we draw the Court to the poignant words of John Anderson, Lee's college friend, wrote in his letter to the Court:

> He's lost his career, in which he took so much pride and could have been so valuable. He's lost former friends who wish to distance themselves from a felon, and many others are quite literally afraid of being attached to him through these character letters and for that reason only will not write one. He is a good man with heart for all and malice for none, and this society is better off with him in it rather than shunned from it. He served friends, family, and community well, and his life is stained only with the blot of a single day years ago. Please give full consideration to this when meting out an appropriate punishment.

Respectfully submitted,
**ROBERTS AND WOOD**

  /s/ *Terrell N. Roberts, III*
Terrell N. Roberts, III
Bar ID No. 01091
*Attorney for Defendant*
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
(301) 699-0764
(301) 699-8706 Fax
TRoberts@robertsandwood.com

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a copy of the foregoing Defendant's Amended Sentencing Memorandum was electronically filed on November 18, 2024, via the CM/ECF File & Serve system, and an electronic copy was e-served on:

Adam Dreher, Esq.
Assistant United States Attorney
Office of the United States Attorney, District of Columbia
555 4th Street, NW
Washington, D.C. 20530

                                           /s/ *Terrell N. Roberts, III*
                                           Terrell N. Roberts, III

**List of Attachments**

1. Statement of Danny Lee & Blanca Chou (Redacted)

2. Statement of Craig Anderson (Redacted)

3. Statement of John Anderson (Redacted)

4. Statement of Kane Hsu (Redacted)

5. Statement of Douglas Drake

6. Maryland OAG Report on Police-Involved Death on July 22, 2023 (Redacted)