**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA,**

v.

**JUSTIN LEE,**

Defendant.

Case No. 1:23-cr-00368 (TNM)

<u>**MEMORANDUM ORDER**</u>

Defendant Justin Lee moves for a judgment of acquittal after his bench trial ended in several guilty counts. For all counts, he insists that the Government did not meet its burden of proof. He also takes issue with the Court's legal conclusions on the elements of his offenses. And he claims that his convictions for a few counts offend the First Amendment.

The Court will ratify its previous findings in all respects. Sufficient evidence supported a guilty verdict for each of the charges. And Lee's legal challenges to the elements lack merit, as they have been considered and rejected already. More, the First Amendment has nothing to say about his conviction. Accordingly, the Court denies Lee's motion for acquittal.

**I.**

Along with thousands of others, Lee attended the Stop the Steal Rally at the White House Ellipse on January 6, 2021.[1] Galvanized by the crowd's fervor, Lee joined the raucous procession from the Ellipse to the Capitol building. Lee and his compatriots approached the west

---

[1] The following background section comes from the Court's oral ruling, Tr. Bench Trial Proceedings III, ECF No. 52; witness testimony credited by the Court, *see* Tr. Bench Trial Proceedings III, 3:15–20 *and generally* Tr. Bench Trial Proceedings I, ECF No. 49; and government exhibits admitted at trial, *see* Gov. Exhibit List, ECF No. 46, *and generally* Tr. Bench Trial Proceedings I.

front of the Capitol grounds, waving flags and sounding bullhorns, only to find that the area had been closed.  Two lines of snow fencing encased the property, and official "Area Closed" signs dotted the lawn.  But Lee and his fellow rioters were undeterred.  With Lee's encouragement and assistance, the crowd scaled the barriers and flooded the restricted area.  Lee even took an Area Closed sign as a souvenir.

The protesters ultimately broke through one police line on the plaza, clearing their path to the Lower West Terrace Tunnel.  There, officers formed a human barrier to prevent the rioters from entering the building.  The crowd launched a violent assault on these officers, beating them with baseball bats and other weapons.  Lee joined in the attack, lobbing an ignited smoke bomb into the enclosed, crowded space.  The smoke bomb struck the shield of Metropolitan Police Department ("MPD") Officer Jason Sterling, causing him to lose his footing, and spewed disorienting smoke through the tunnel.  Sterling and his fellow officers struggled to see through the haze.

But Lee was not done.  He then threw three more objects at the police line as other rioters continued to beat and berate the officers.  And he pointed a flashlight into the dark tunnel, turning it on and off in rapid succession to produce a dizzying strobe-like effect.  The officers released tear gas into the crowd, and Lee left the property.

Lee later was indicted on seven counts.  Indictment, ECF No. 1.  He waived his right to a jury and proceeded to a bench trial.  Waiver of Trial by Jury, ECF No. 11.  After a two-day trial, the Court found Lee guilty of five of the charges.  Minute Entry 08/23/2024.  As sentencing loomed, Lee filed the present motion for acquittal.  Def.'s Mot. Acquittal, ECF No. 48.  The Government opposed the motion.  Gov. Opp'n Br., ECF No. 50.  The motion is now ripe for review.

## II.

Following a guilty verdict, a defendant can move for a judgment of acquittal.  Fed. R. Crim. P. 29(c).  This is a high hurdle to surmount.  *United States v. Hale-Cusanelli,* 628 F. Supp. 3d 320, 324 (D.D.C. 2022).  The verdict may be reversed "only if no reasonable [factfinder] could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt."  *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983).  The Court must "view the evidence in the light most favorable to the verdict" and "presume that the [factfinder] has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences."  *Id.*  Essentially, a motion for judgment of acquittal "succeeds only where the Government's case is legally defective or has suffered a significant failure of proof."  *United States v. Cappuccio*, 2023 WL 6975931, at *1 (D.D.C. Oct. 23, 2023).

## III.

Lee objects to all five of his guilty charges, but for varying reasons.  The Court addresses Lee's objections count-by-count.

## A.

Start with Lee's conviction for a civil disorder in violation of 18 U.S.C. § 231(a)(3).  Lee mounts two lines of attack here.  First, he insists that the charge violates the First Amendment.[2] Alternatively, he asserts that the evidence could not sustain a guilty verdict.  Neither contention has merit.

---

[2]  Before trial, Lee argued that 18 U.S.C. § 231(a)(3) is facially unconstitutional.  Mot. Dismiss Count, ECF No. 18.  Now, he insists that it is unconstitutional as applied to him.  Def.'s Mot. Acquittal 3–9.

To begin with, the civil disorder conviction does not infringe on Lee's First Amendment rights. Lee points out that the charge rests on his throwing of the smoke bomb at the officers. Def.'s Mot. Acquittal at 3–4. But he claims that this act was expressive, as "he intended to convey a particular message by tossing a small smoke bomb in the direction of [the] group of police officers defending [the] tunnel." *Id.* at 4. This message was allegedly one of "protest," as "he objected to the manner in which the police discharged their duties on January 6." *Id.* According to Lee, this valiant message "would have been understood by the persons who viewed it." *Id.*

The Court cannot agree. For conduct to qualify as protected speech, there must be both "[a]n intent to convey a particularized message," and a "great" likelihood "that the message would be understood by those who viewed it." *Spence v. State of Wash.*, 418 U.S. 405, 411 (1974). Lee fails on both elements. As for the intent prong, the Court already found that Lee's "police protest" motivation was not credible. Tr. Bench Trial Proceedings III, 6:3–5 ("I do not believe Mr. Lee's claim that he was trying to make a statement about police brutality."). The Court stressed that "the officers in the tunnel were clearly in defensive mode," as "[t]hey literally had their backs to the wall and [were] being attacked by a large and violent crowd of rioters." Tr. Bench Trial Proceedings III, 6:7–11. So "[w]hile Mr. Lee may well have been irate or angry at the officers for various reasons," the Court thought "he was doing something very different from just making his voice heard. He was aiding his fellow rioters and seeking to interfere with the officers' performance of their duties." Tr. Bench Trial Proceedings III, 6:14–18. Viewing the evidence in the light most favorable to the Government, this credibility determination was rational. Lee joined in the mob after attending the Stop the Steal Rally. He flooded the property with his fellow rioters as they tried to break into the building and disrupt the certification. But

they found the police in the way, so the mob tried to remove them by force. The Court has little reason to revisit its prior determination that Lee "shaded his testimony . . . to give post hoc justifications for his actions," including the decision to throw smoke bomb. Tr. Bench Trial Proceedings III, 4:5–6. So Lee has failed to plausibly identify a message he intended to communicate.

But even if Lee had subjectively wanted to convey a message about police brutality, his conviction would still stand. For one, those around him were unlikely to understand that Lee was protesting the officers' behavior. Lee failed to distinguish himself from the violent throng hellbent on breaking the police lines and storming into the Capitol Building. So viewers would not have perceived Lee's contribution as anything more than a show of force.

But more importantly, the First Amendment does not protect expression that is "an integral part of conduct in violation of a valid criminal statute." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). "Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected." *United States v. Hansen*, 599 U.S. 762, 783 (2023). This makes sense; under Lee's theory, any assassin or political terrorist would have a get-out-of-jail-free card if his violent actions had expressive overtones. This is not the law.

Here, Lee's purported "expression" was to lob an incendiary device at a line of officers who were struggling to defend themselves against mass violence. This conduct was "integral" to Lee's crime of disrupting official law enforcement functions. *New York v. Ferber*, 458 U.S. 747, 761 (1982). Lee's First Amendment challenge to his § 231(a)(3) conviction fails.

Lee tries a different tack, arguing that the record could not support his conviction under § 231(a)(3). Def.'s Mot. Acquittal at 9–13. But all his arguments do is tell the Court it got it wrong the first time. He rehashes the same rebuttals that the Court rejected during his trial. For

instance, he claims that the evidence was insufficient to show that he interfered with law enforcement functions or that the civil disorder affected commerce. *Id.* But the question of whether the Government met its burden on these elements was already presented to the Court, and the Court found that the proof was sufficient. Tr. Bench Trial Proceedings III, 5:12–11:20. Unlike a jury trial verdict, Lee's bench trial verdict was accompanied by detailed findings of fact supporting the decision. *Id.* Lee's evidentiary challenge is accordingly "superfluous," as "[b]y rendering a verdict of guilty," the Court already "rule[d] on the sufficiency of the evidence." *United States v. Atkinson*, 990 F.2d 501, 505 (9th Cir. 1993). And without new arguments or evidence, the Court will not say its prior conclusions were irrational.

Lee also pokes holes in the Court's reading of § 231. Def.'s Mot. Acquittal 11–12 (arguing MPD officers cannot carry out a "federally protected function"). But his challenges to the statutory elements are nothing new. They were already heard and rejected. Tr. Bench Trial Proceedings II, ECF No. 63, at 119:18–21. The Court sees no justification for reconsidering those rulings when Lee has not offered any new contentions. *Accord Hale-Cusanelli*, 628 F. Supp. 3d at 325 (declining to "revisit [the] pretrial ruling" on a Rule 29 motion where defendant merely "restate[d] many previously-denied arguments"). Lee's § 231(a)(3) conviction stands.

**B.**

Next consider Lee's challenges to his conviction for forcible interference with a law enforcement officer under 18 U.S.C. § 111(a)(1). He starts with a fruitless argument: that assault is a required element of every offense encompassed in § 111(a)(1). Def.'s Mot. Acquittal at 13–15. The Court has already rejected this reading of the statute. Tr. Bench Trial Proceedings II, 121:18–23. The statute requires proof of an underlying assault to establish the "simple assault misdemeanor" and "physical contact felony," but that such proof is not required for the "other-

felony offense." Tr. Bench Trial Proceedings II, 121:18–22; *see also United States v. Cua*, 657 F. Supp. 3d 106, 113–14 (D.D.C. 2023). Lee offers nothing new to rebut this interpretation.

So Lee's claim that the evidence is insufficient to support the finding of a simple assault is off-base. Def.'s Mot. Acquittal at 15–16. The Government did not need to prove an underlying assault to establish Lee's guilt for the § 111(a)(1) count because the Court found Lee had intent to commit a different felony—18 U.S.C. § 231(a). Tr. Bench Trial Proceedings II, 14:15–21. And for reasons already discussed, the § 231(a) conviction stands. So the § 111(a)(1) count stands, too.

Lee tries something new to cast doubt on his § 111(a)(1) conviction. He notes that § 111(a)(1) requires a showing that the defendant forcibly interferes with "any person designated in [18 U.S.C.] § 1114(a)." Def.'s Mot. Acquittal at 16. And that § 1114(a) is limited to "any officer or employee of the United States or of any agency in any branch of the United States Government," or "any person assisting such an officer or employee in the performance of such duties." *Id.* (quoting 18 U.S.C. § 1114(a)). But Lee argues that "[t]he government's evidence failed to prove that [MPD] Officer Jason Sterling"—the immediate victim of Lee's forcible interference—"assisted a person designated in § 1114 at the time of the offense." *Id.* In other words, Lee argues that the Government only proved he forcibly interfered with an MPD officer but not that the MPD officer was assisting federal officers at the time of Lee's unlawful conduct.

Lee's reading of the statute is accurate. That is why the Court explicitly found that Lee forcibly interfered with Officer Sterling's ability to aid the Capitol Police. Tr. Bench Trial Proceedings III, 14:8–12 ("This element is easily met as Officer Sterling and his colleagues were all in uniform and clearly acting in response to an emergency call for assistance from U.S.

Capitol Police and, in fact, there were U.S. Capitol Police officers present.").  So Lee's argument that the Government failed to prove all the elements of his § 111(a) charge fails.

**C.**

Next, Lee argues that the evidence to sustain his convictions under 18 U.S.C. §§ 1752(a)(1), (a)(2) was legally insufficient.  Def.'s Mot. Acquittal 16–17.  These charges were for entering and remaining in a restricted building and engaging in disorderly and disruptive conduct in a restricted building, respectively.  Lee takes a few different shots at these convictions, all of which miss their mark.

Lee starts by bringing another First Amendment challenge.  He insists that the Capitol Building was not "restricted" because it is a traditional public forum.  Def.'s Mot. Acquittal at 16–17.  And he stresses that the Government "failed to demonstrate a legitimate interest for closing off nearly 90% of the open areas . . . of the Capitol Grounds, keeping thousands of people far back from the object of their protest, which was to be seen and heard by their elected representatives."  *Id.* at 17.  Essentially, Lee argues that he and his fellow rioters had a First Amendment right to be on the Capitol Grounds on January 6, and so he cannot be punished for being there.

The Court disagrees.  The Government can regulate speech in traditional public fora with reasonable time, place, and manner restrictions.  *Clark v. Cmty for Creative Non-Violence*, 468 U.S. 288, 29 (1984).  These restrictions are valid "provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."  *Id.*  All these elements are satisfied here.

To start, the restrictions around the Capitol Building on January 6 sought to prevent violent conduct, not speech. *See* Tr. Bench Trial Proceedings I, 26:18–23; *Hansen*, 599 U.S. at 783 (expression that facilitates a criminal violation is not protected by the First Amendment). But even if the criminalized conduct could be considered expressive, the restrictions were content-neutral. The area was not closed to any one group of people discussing a certain topic. Instead, it was walled off to all members of the public *writ large*. Thus the security measures did not "single out any topic or subject matter for differential treatment." *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 71 (2022). Instead, they were wholly "agnostic as to content." *Id.* at 69*; cf. United States v. Rhine*, 652 F. Supp. 3d 38, 60–61 (D.D.C. 2023).

More, the safeguards in place at the Capitol on January 6 were narrowly tailored to serve a significant government interest: keeping those inside the building safe. Per Lee's own admission, the events of January 6th were "foreseeable" and required extensive security arrangements. Def.'s Mot. Acquittal at 12–13. More, the COVID-19 pandemic was still raging, meaning crowds of people brought a heightened risk of infection. Tr. Bench Trial Proceedings I, 26:24–27:2. Securing the perimeter of the Capitol Grounds during a particularly sensitive event while a deadly virus lurked was a "measured approach . . . tailor[ed] to the public safety interest" at stake. *Tinius v. Choi*, 77 F.4th 691, 700 (D.C. Cir. 2023) (upholding two-night curfew "in response to a spike in serious crime" as a valid time, place, and manner restriction); *see also Sanders v. United States*, 518 F. Supp. 728, 729 (D.D.C. 1981), *aff'd*, 679 F.2d 262 (D.C. Cir. 1982) (upholding protest restrictions at the Ellipse where the government had an interest in "safety, order, and convenience of those other citizens already participating in the preexisting event").

9

Finally, ample alternative methods of communication remained.  Protestors were free to stand just outside the marked perimeter.  They could expound their views from the surrounding sidewalks.  *Lederman v. United States*, 291 F.3d 36, 44 (D.C. Cir. 2002) (calling the sidewalks around the Capitol a "centerpiece of our democracy.").  Or they could fill the surrounding streets, as they were closed to traffic on January 6.  Tr. Bench Trial Proceedings II, 43:5–9, 51:6–13.  Signs and bullhorns could adequately amplify their message to reach the Members of Congress inside the Capitol.  In short, the perimeter restrictions on the Capitol Grounds did not deprive protesters alternative channels of communication.  *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2005) (finding a restricted zone left open alternative methods of communication where "protesters were able to demonstrate and express their views immediately outside the restricted zone," even though "protestors could not deliver their message directly to delegates" inside the bounded perimeter).  There is no First Amendment impediment to Lee's convictions under 18 U.S.C. §§ 1752(a)(1), (a)(2).

Lee also presents a losing argument by insisting the Government had to prove he knew that the Vice President was in the Capitol on January 6 to establish a violation of § 1752.  Def.'s Mot. Acquittal at 18.  This interpretation was soundly rejected during the Court's oral ruling on the elements of the offense.  Tr. Bench Trial Proceedings II, 124:20–25. And since Lee's trial, the argument has been rebuffed by the D.C. Circuit.  *See United States v. Griffin*, 119 F.4th 1001, 1003 (D.C. Cir. 2024).

Lee next argues that the Government failed to prove that his conduct was disruptive or disorderly.  Def.'s Mot. Acquittal at 20.  But again, the Court is not convinced by a simple rehashing of the sufficiency arguments made and rejected at trial.  The Court found that "Mr. Lee's conduct, to include throwing a smoke bomb, multiple rock-like objects at officers in a

tunnel and spotlighting them while they were trying to defend themselves from a violent mob, certainly [was disruptive]." Tr. Bench Trial Proceedings III, 18:9–12. It will not now hold that finding irrational in the face of no new evidence.

Finally, Lee contends that the evidence could not show his conduct in fact impeded official functions. Def.'s Mot. Acquittal 20–21. He points out that "[i]f [he] had not been there at all, nothing different would have happened." Def.'s Mot. Acquittal 21. And he insists that "[h]is conduct *outside* the Capitol in fact did not delay the proceedings *inside* the Capitol." *Id.* The Court's prior findings squarely dispose of these arguments. The Court already concluded that "the Capitol went into lockdown at approximately 2 p.m. because rioters had breached the security perimeter," then "remained in lockdown until later that evening because of the continued presence of the rioters." Tr. Bench Trial Proceedings III, 18:22–24, 19:1–2. Lee's participation in the mob outside thus "disrupted and delayed the certification of the electoral college votes for many hours." Tr. Bench Trial Proceedings III, 19:3–4. While Lee may not have *individually* brought the certification to a halt, this is no matter. His decision to participate in the violent mob made him partially responsible for the consequences of that group's collective action. Lee's consequentialist argument to the contrary is pedantic and unavailing. *United States v. Rivera*, 607 F. Supp. 3d 1, 9 (D.D.C. 2022), *aff'd*, 2023 WL 8594077 (D.C. Cir. Dec. 12, 2023) ("Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption."). And it does not convince the Court that it made an irrational decision the first time around.

More, the Court found that Lee's *individual* conduct did in fact impede official functions of the Government. Lee's actions, "most notably tossing the smoke bomb, did further

complicate and exacerbate the situation Officer Sterling and his colleagues were dealing with." Tr. Bench Trial Proceedings III, 19:6–9. The § 1752 counts are accordingly sound.

**D.**

Last, Lee assails his conviction for willfully engaging in disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D). He insists that the Government failed to show he acted willfully, which "requires proof that the accused knew that the conduct he was charged with committing was unlawful." Def.'s Mot. Acquittal 21 (citing *United States v. Burden*, 934 F.3d 675, 693 (D.C. Cir. 2019)). Lee dubiously asserts that "[h]e simply did not appreciate that his conduct was unlawful." *Id.* at 22. This strains credulity. Lee joined a riotous and violent throng of protestors to breach the security perimeter of the Capitol. He made his way to the Tunnel and witnessed his allies physically attacking officers. Rather than trying to stop the brutality, Lee contributed to it, throwing a smoke bomb and various objects at the officers and using a flashlight to disorient them. This was not an innocent attempt to engage in lawful expressive conduct, as Lee claims. This was rampaging. The § 5104(e)(2)(D) conviction remains.

**IV.**

It is accordingly **ORDERED** that Defendant's Motion for Acquittal is DENIED. **SO ORDERED**.

Dated: November 20, 2024                              _____
                                                     TREVOR N. McFADDEN, U.S.D.J.